# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO
_____

UNITED STATES OF AMERICA

       Plaintiff,

    vs.                                     Case No. 1:18-cr-1960 WJ-1

GUILLERMO MARTINEZ-TORRES, and
JESUS GOMEZ-ARZATE,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER DENYING DEFENDANTS' MOTION TO SUPPRESS</u>

THIS MATTER comes before the Court on Defendant Jesus Gomez-Arzate's Motion to Suppress Evidence, filed August 17, 2018 (**Doc. 29**), joined by his co-Defendant Guillermo Martinez-Torres (**Doc. 31**).  Having considered the parties' arguments and applicable law, the Court finds that Defendants' motion is not well-taken and, therefore, is **DENIED.**

## BACKGROUND

On June 13, 2018, Defendant Martinez-Torre and Defendant Jesus Gomez-Arzate were indicted with possession with intent to distribute 500 grams and more of a mixture containing methamphetamine, in violation of 21 USC §§ 841(a)(1), (b)(1)(A), and 846.  **Doc. 15.**

The Court makes the following factual findings following an evidentiary hearing.[1]  The Court finds the deputies' and trooper's testimony to be credible.

---

[1] To avoid repetition, additional facts are found below in the discussion section.  A portion of the encounter was audio-recorded. The 33-minute audio recording was played during the evidentiary hearing, and a transcript with an English translation was used to follow along.  The transcript was admitted without objection, and neither party pointed out any inaccuracies in the transcript.  Therefore, the Court relies on the transcript and refers to English translations of any Spanish spoken.

A.    **Initial Traffic Stop**.

On May 17, 2018, Defendants were traveling eastbound on Interstate 40 in a 2012 white KIA Soul.  After a line of cars passed him, Deputy Mora pulled out from a median.  Around mile marker 133 he spotted the Defendants' vehicle.  He observed the Kia Soul swerving within the right-hand lane, and also straddling the right-hand white solid line twice.  Deputy Mora also observed that the front driver's side tire appeared to be angled or out of alignment.  Deputy Mora did not observe any external explanation for why the Kia Soul was swerving, aside from the front tire being "bent."

At around mile marker 132, Deputy Mora pulled over the Kia Soul.  He approached the front passenger side window, and immediately noticed an "overwhelming odor of air freshener", from multiple air fresheners.  Based on his experience and training, Deputy Mora knew that an air freshener can be used to mask the smell of drugs or contraband.  Defendant Martinez-Torres was the driver, and the passenger, Defendant Gomez-Arzate, purported to be the owner of the car.

Deputy Mora explained to the Defendants that he pulled them over because they were swerving, and that the axle or wheel appeared to be bent.  Deputy Mora asked for and obtained Defendant Martinez-Torres' driver's license, registration, and proof of insurance.  Defendant Martinez-Torres produced a California driver's license.  The car had Texas plates, and was registered to an absent third party.

Although Deputy Mora attempted to speak with Defendants, Defendant Martinez-Torres stated he didn't understand him.  At approximately 3 minutes and 38 seconds into the stop, Deputy Mora called for Deputy Mauricio, who spoke fluent Spanish, to come and translate.  Calling other deputies who are bilingual and fluent in Spanish to translate is common practice within the department.  At around this time, Deputy Mora began filling out a warning citation.

It is also clear that a Spanish translator was necessary. Defendants – multiple times – expressed that they couldn't understand Deputy Mora. Therefore, it was reasonable and necessary for Deputy Mora to wait for a translator to arrive. Without a translator, he could not even explain the citation or the reason for the traffic stop.

Defendants tried to speak with Deputy Mora, while Deputy Mora suggested they wait for Deputy Mauricio to arrive. Defendants asked Deputy Mora whether he wanted to know their "motive of the trip." **Gov. Ex. 3, p. 6.** They also asked about the speed limit. While waiting, Defendant Martinez-Torres stated that he lived in Santa Ana, California and that he would like to move to Texas because the rent is cheaper and there is more work.

**B.    Deputy Mauricio arrives during traffic stop (Minute 10:00 to Minute 16:00).**

Deputy Mauricio arrived at around ten minutes into the stop. It took him approximately seven minutes to arrive after he was called. After Deputy Mauricio began translating, there was no indication that Defendants had any further difficulty in understanding the deputies.

Deputy Mauricio asked for permission to search the VIN number of the car and both Defendants consented. The deputies checked the VIN on both the dashboard and the door. This process took a "couple minutes."

At the same time, the deputies also asked permission to ask questions about Defendants' travel plans. This took approximately two minutes and fifteen seconds, but overlapped with the VIN search. Defendant Gomez-Arzate said that they were coming from California, and were going to Dalhart first, then Dumas, Texas.

At around 13 minutes and 17 seconds, the deputies asked who owned the car, because neither Defendant was on the registration. Defendant Gomez-Arzate said the car belonged to a

man in Texas who let them borrow it. They stated the owner lives in Dumas, and they were going to his house to "clean it up", live there, and possibly raise cattle.

Defendants stated they were traveling to Texas, from California, to clean up a house to make it habitable. They also stated they were only staying for three or four days. Then, they were going back to California for their family, to move to Texas.

At around fifteen minutes into the traffic stop, Deputy Mora explained to Defendant Martinez-Torres that he was giving him all of his documents back and that he was giving him a warning citation for hitting the solid white line twice. The Deputies also explained this to Defendant Gomez-Arzate. *See* **Gov. Ex. 3, p. 23-24.** In his traffic citation, he noted that Defendant hit the shoulder solid line twice, and that he violated the careless driving statute (NMSA § 66-8-114). **Gov. Ex. 1.** Deputy Mora gave the citation to Defendant Martinez-Torres, who signed it.

### C. Further Questioning (minute 16:00 to approximately minute 33:00).

After receiving his documents back and his warning citation, Defendant Martinez-Torres began walking back to his car. Deputy Mora said "Guillermo" and Defendant Martinez-Torres walked back to the patrol car, a distance of approximately 20 feet.

Deputy Mora explained to Defendant Martinez-Torres that he was free to go, but that he had a couple more questions, "if that's okay." His response was inaudible on the recording. The Deputies repeated a second time "do you understand that you are free to go?" Defendant Martinez-Torres responded "yes." Defendant Martinez-Torres did not object or indicate he wanted to leave.

At approximately twenty minutes into the encounter, the deputies received consent from Defendant Gomez-Arzate. Deputy Mauricio explained to Gomez-Arzate that they had only given a warning to Martinez-Torres for crossing the white line, and that they told him that he's free to

go.  They also told Gomez-Arzate that he was free to go and asked for consent to ask further questions.  Defendant Gomez-Arzate consented.

Defendant Gomez-Arzate stated they were going to Dumas, Dalhart, and Hartley, near Amarillo, to a ranch.  They stated the ranch was forty minutes from Amarillo.  They stated they were going there to clean a house, to work or live there.

The deputies then asked where they got the car.  They stated they got the car from the ranch.  He stated the previous time he was there, his truck broke down and the owner lent the KIA Soul to him.  Defendant Gomez-Arzate said he then took the KIA Soul with him back to California, and that he has had it for months.

Defendant Gomez-Arzate did not know the name of the owner of the car, but that he knew the name of the owner's friend.

Defendants affirmed that they were responsible for everything inside the car.  Defendants denied having any large amounts of money, drugs, or weapons.  Defendants then consented to the search of the car orally[2] and in writing.  They affirmed that they understood the written consent form and could read Spanish.  The transcript reflects that they also understood Deputy Mauricio's Spanish.

After the Defendants consented to the search, the audio recording ended.

### D.    Search of Car.

As Deputy Mora was searching the vehicle, he saw tool marks on the right rear quarter panel.  He slightly pulled back the rear quarter panel and saw a circular void.  The rear quarter panel was held in place with plastic rivets.  He then pulled off the rear quarter panel, and saw two

---

[2] Defendant Martinez-Torres' oral response is inaudible on the audio recording.  Deputy Mora asked for permission to search.  However, Defendant Martinez-Torres signed the written consent form.

round packages, wrapped in black tape, which he knew was consistent with contraband. The search lasted approximately one hour and 30 minutes.

The Court credits Deputy Mora's testimony that he only had to pull back the quarter panel a slight degree before he saw a circular void. Based on his experience and training, once he saw that void, he had reasonable suspicion that the void contained drugs.

The deputies apparently removed the air filter. A picture in evidence shows a toolbox on the car, with the hood open. There is no evidence in the record that anything else was done to the engine. Moreover, the Deputies removed the fender because it was not flush with the car, but also put it back on. Items were taken out of the trunk and placed on the ground. There is no evidence of any further "dismantling" of the car.

## DISCUSSION

Defendants argue that evidence resulting from the traffic stop should be suppressed, because the traffic stop itself either (1) was not initially valid, or alternatively (2) became invalid because it was extended for too long. Even if the traffic stop was valid, Defendants argue either that the resulting consent to search the car was invalid or outside the scope of consent.

"[A] traffic stop is reasonable if it is (1) justified at its inception and (2) reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Moore*, 795 F.3d 1224, 1228 (10th Cir. 2015 (quoting *United States v. Karam*, 496 F.3d 1157, 1161 (10th Cir. 2007)).

## I. <u>Initial Traffic Stop was Valid.</u>

Defendant argues that the initial traffic stop was not valid, because it was not supported by reasonable suspicion. The Government argues that there was reasonable suspicion to stop the car

either for careless driving or for failure to maintain the vehicle in its lane. The Court agrees with the Government.

To justify a traffic stop at its inception, "an officer needs only reasonable suspicion—that is, a particularized and objective basis for suspecting the particular person stopped of breaking the law. [T]he government bears the burden of proving the reasonableness of the officer's suspicion." *United States v. Vance*, 893 F.3d 763, 773 (10th Cir. 2018) (internal quotation marks and citations omitted). "For reasonable suspicion to exist, an officer need not rule out the possibility of innocent conduct; he or she simply must possess some minimal level of objective justification for making the stop." *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009) (internal quotation marks omitted).

## A.    Careless driving.

New Mexico law requires drivers to not drive in a "careless, inattentive, or imprudent manner, without due regard for the width, grade, curves, corners, traffic, weather and road conditions and all other attendant circumstances," NMSA § 66-8-114. Here, Deputy Mora observed that Defendant Martinez-Torres was swerving within his lane and also straddled the white solid right-hand line twice. Based on these observations, an objectively reasonable officer would have reasonable suspicion that Defendant Martinez violated the careless driving statute by either driving carelessly or inattentively without due regard for the width of the road or other "attendant circumstances."

## B.    Failure to stay entirely within lane.

Alternatively, the traffic stop was also justified at its inception based on a reasonable suspicion of a violation of NMSA § 66-7-317, failing to maintain lane. That statute provides in part:

Whenever any roadway has been divided into two or more clearly marked lanes for traffic the following rules in addition to all others consistent herewith shall apply: **A. a vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety;**

N.M. Stat. Ann. § 66-7-317 (emphasis added).

To show a violation of NMSA § 66-7-317, the Government must first show that Defendants failed to drive "as nearly as practicable entirely within a single lane." This is a fact-driven analysis under the totality of the circumstances. *State v. Siqueiros-Valenzuela*, 2017-NMCA-074, ¶ 26, 404 P.3d 782, 788, *cert. denied* (July 6, 2017), *citing United States v. Alvarado*, 430 F.3d 1305, 1309 (10th Cir. 2005) (interpreting identical language in Utah law); *see also United States v. Vance*, 893 F.3d 763, 772 (10th Cir. 2018) (interpreting NMSA § 66-7-317).

"This totality of the circumstances analysis takes into account whether there were any weather conditions, road features, or other circumstances that could have affected or interfered with a driver's ability to keep his or her vehicle in a single lane." *State v. Siqueiros-Valenzuela*, 2017-NMCA-074, ¶ 19, 404 P.3d 782, 787, *cert. denied* (July 6, 2017), *citing Alvarado*, 430 F.3d at 1309. There is no *per se* rule that touching the fog line does or does not constitute a violation of NMSA § 66-7-317. *United States v. Alvarado*, 430 F.3d 1305, 1309 (10th Cir. 2005) (rejecting argument that touching fog line once does not constitute violation of statute). Rather, the statute requires "a fact-specific inquiry into the particular circumstances present during the incident in question in order to determine whether the driver could reasonably be expected to maintain a straight course at that time in that vehicle on that roadway." *Id.*

Here, the clear evidence shows that there was no circumstance that affected or interfered with Defendant Martinez-Torres' ability to keep his car within his lane. *United States v. Valenzuela,* 494 F.3d at 888–89 ("In this case, nothing in the record suggests any outside factors contributed to Defendant's lane drift" which was a single drift from the left westbound lane into

right westbound lane for several seconds and then return to the left lane.); *United States v. Alvarado,* 430 F.3d at 1309 ("[T]here were no adverse weather or road conditions that might have made it impractical for Alvarado to prevent his vehicle from drifting out of the righthand lane and over the fog line" by about a foot for several seconds before crossing back.); *United States v. Ozbirn*, 189 F.3d 1194, 1199 (10th Cir. 1999) ("Officer "observed the motor home drift onto the shoulder twice within a quarter mile without any adverse circumstances like road or weather conditions to excuse or explain the deviation."). Defendants were not passing other vehicles, and there were no adverse weather conditions. Nevertheless, Defendant Martinez-Torres swerved within his lane and also straddled the right-hand white line twice. Under the totality of the circumstances, the Court concludes that Defendant Martinez-Torres failed to drive "as nearly as practicable entirely within a single lane."

Finally, Deputy Mora's observations of Defendant's swerving and straddling the line supports a finding that Defendant Martinez-Torres did not first ascertain whether such movement could be made with safety. Defendant's straddling of the white line was clearly not a deliberate decision.

Therefore, based on Deputy Mora's observations, an objectively reasonable officer would at the very least have reasonable suspicion that Defendants violated either the careless driving statute or NMSA § 66-7-317.

## II.     Traffic stop was not unreasonably extended after Deputy Mauricio arrived (approximately 10 minutes to 16 minutes into encounter).

Defendants argue that even if the initial traffic stop was valid, it became invalid because it was extended in scope and duration beyond the initial purpose of the stop, violating *Rodriguez v. United States,* ── U.S. ──, 135 S.Ct. 1609, 1614, 191 L.Ed.2d 492 (2015). Defendant argued

at the hearing that the traffic stop was unlawfully extended after Deputy Mauricio arrived. At that time, he argues, the deputies should have given Defendant Martinez-Torres his traffic citation and gone on their way.

"[A] lawful traffic stop may not extend beyond the time reasonably required to effectuate its purpose." *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015), *citing Rodriguez v. United States,* —— U.S. ——, 135 S.Ct. 1609, 1614, 191 L.Ed.2d 492 (2015). "In particular, questioning on matters *unrelated* to that mission is improper if it measurably extend[s] the duration of the stop." *United States v. Cone*, 868 F.3d 1150, 1152–53 (10th Cir. 2017) (emphasis added), *cert. denied*, 138 S. Ct. 707, 199 L. Ed. 2d 578 (2018), *citing Rodriguez*, 135 S.Ct. at 1615 (internal quotation marks omitted). "Once the warning or citation has been issued and the driver's license and registration have been returned, however, the officer generally must allow the driver to proceed without further delay*." United States v. Karam*, 496 F.3d 1157, 1161 (10th Cir. 2007), *citing United States v. Patterson,* 472 F.3d 767, 776 (10th Cir.2006).

However, "a traffic stop may be expanded beyond its initial purpose if the traffic stop has become a consensual encounter, or if the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring." *United States v. Moore*, 795 F.3d 1224, 1229 (10th Cir. 2015) (internal citation and quotation marks omitted).

**A.**     **Traffic stop was not unreasonably extended or prolonged.**

During the traffic stop, the deputies explained the reason for the traffic stop and Defendants' alleged violation, explained there was a safety issue with the car, asked for permission to search the VIN, asked about their travel plans while doing the VIN search, and asked about the owner of the car, who was an absent third party. Under these circumstances, the Court concludes

that all of these actions are within the scope and purpose of a traffic stop, and otherwise did not unreasonably extend the traffic stop.

A deputy may routinely ask questions about travel plans and car ownership in a traffic stop, and such questions are within the scope of a traffic stop. These questions are related to the traffic stop and do not impermissibly extend the duration of the stop. *See United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1259 (10th Cir. 2006) ("Such limited questioning is proper, because an officer may routinely ask about travel plans and ownership during a lawful traffic stop."), *citing United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005) (officer may ask routine questions about the driver's travel plans); *see also United States v. Williams,* 271 F.3d 1262, 1267 (10th Cir.2001) ("[W]e have repeatedly held (as have other circuits) that questions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop."); *see also United States v. Patterson*, 472 F.3d 767, 776–77 (10th Cir. 2006) (speaking to passengers about traffic plans is within scope of traffic stop for speeding), *cert. granted, judgment vacated on other grounds*, 555 U.S. 1131, 129 S. Ct. 989, 173 L. Ed. 2d 283 (2009). Moreover, if a deputy may ask for a car's registration, it would be absurd to prohibit questions about obvious ownership questions arising from viewing the registration.

This is the same for VIN searches, which are one of the "ordinary inquiries incident to [] a stop." *United States v. Ramos*, 723 F. App'x 632, 637 (10th Cir.) (unpublished) (VIN search within scope of routine traffic stop), *cert. denied*, 139 S. Ct. 132 (2018), *citing New York v. Class*, 475 U.S. 106, 115, 118-19, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986) ("a demand to inspect the VIN, like a demand to see license and registration papers, is within the scope of police authority pursuant to a traffic violation stop.").

Defendants argue that *United States v. Caro*, 248 F.3d 1240 (10th Cir. 2001) indicates that a search of both the dashboard and doorjamb VIN is a detention, but that case is limited to "when (1) the officer has verified the dashboard or doorjamb VIN from outside the passenger compartment and (2) the officer nevertheless physically enters the passenger compartment to check the VIN." *United States v. Chavira*, 467 F.3d 1286, 1289 n.1 (10th Cir. 2006). "There is no unlawful detention under *Caro* if the officer remains physically outside the car when he examines the VIN on the dashboard, the doorjamb, or both." *Id.* Here, the Deputies received consent to do a VIN search and there is no evidence in the record that any deputy physically entered the passenger compartment to check the doorjamb VIN.

The VIN search and all questions were related to and within the scope of the traffic stop. Therefore, nothing unrelated to the traffic stop impermissibly extended the stop.

Moreover, the Court notes that the specific timing of the acts performed were caused by the delay in seeking a Spanish interpreter. Had there not been that delay Deputy Mora likely could have asked these questions – and performed the VIN search – while writing out the citation. Defendants' objections based on the order of the specific acts in the traffic stop was rejected by the Tenth Circuit. *United States v. Valenzuela*, 494 F.3d 886, 890 (10th Cir. 2007). The "order of events" is not determinative, but rather the Court should focus on the "reasonableness of the traffic stop in light of both the length of the detention and the manner in which it was carried out ..." *Id.* Based on the specific circumstances of this case, asking these routine questions and performing a VIN search after the citation was written but before it was given to Defendants did not unreasonably extend the duration of the stop.

Moreover, the duration of the traffic stop was not extended beyond the time reasonably required to complete it. The fifteen to sixteen-minute duration was reasonably required to

effectuate the traffic stop. Seven of those minutes were spent waiting for Deputy Mauricio to arrive to translate during which Deputy Mora filled out the citation. Finally, the transcript and the evidence produced at the hearings showed that the deputies were diligent in performing the traffic stop. For example, it appears they asked questions while at the same time performing the VIN search. Defendants do not argue otherwise, aside from failing to give the warning citation immediately upon Deputy Mauricio's arrival.

Notably, if Deputy Mora declined to write out the citation during the seven-minute delay, there would likely be an objection that he did not work diligently. In other words, the result of Defendants' argument is that deputies may not ask any questions of Spanish-speaking Defendants if there is a delay in getting a translator. The Court does not believe the Tenth Circuit would so hold under these specific factual circumstances.

Therefore, the Court concludes that the time from Deputy Mauricio's arrival to the moment Deputy Mora gave and returned their documents (approximately sixteen minutes into the encounter) did not exceed the scope of the traffic stop.

**B.      Deputy Mora had reasonable suspicion of criminal activity, permitting him to ask follow-up questions related to ownership of the car and travel plans**.

Alternatively, even if the traffic stop was unreasonably extended in scope or duration, Deputy Mora had reasonable suspicion of criminal activity and authority to ask follow up questions and perform a VIN search. *See, e.g., United States v. Clarkson*, 551 F.3d 1196, 1201 (10th Cir. 2009) ("The traffic stop may be expanded beyond its original purpose if during the initial stop the detaining officer acquires reasonable suspicion of criminal activity."), *cited in Vasquez v. Lewis*, 834 F.3d 1132, 1136 (10th Cir. 2016), *cert. denied*, 137 S. Ct. 1580, 197 L. Ed. 2d 705 (2017).

"The reasonable suspicion analysis does not consider each of an officer's observations in isolation, but rather is based on the totality of the circumstances, taking into account an officer's reasonable inferences based on training, experience, and common sense." *United States v. Garcia*, 751 F.3d 1139, 1143 (10th Cir. 2014) (quotation marks and citation omitted), *cited in United States v. Hernandez*, 847 F.3d 1257, 1277 (10th Cir. 2017). "Reasonable suspicion may derive from a series of acts, each of them perhaps innocent if viewed separately, but which taken together warrant [ ] further investigation." *United States v. Hernandez*, 847 F.3d 1257, 1277 (10th Cir. 2017) (internal quotation marks omitted).

First, Deputy Mora smelled an "overwhelming smell of air freshener." Based on his experience and training, Deputy Mora knew that an air freshener could be used to mask the smell of drugs. Second, Defendant Martinez-Torres had a California driver's license, but was driving a vehicle with Texas license plates. Third, the registration listed an absent third party. *See United States v. Pettit*, 785 F.3d 1374, 1381–82 (10th Cir. 2015) (registration to absent third party can indicate drug trafficking), *citing United States v. Ludwig,* 641 F.3d 1243, 1249 (10th Cir.2011); *United States v. Turner,* 928 F.2d 956, 959 (10th Cir.1991); *See also United States v. Moore*, 795 F.3d 1224, 1231 (10th Cir. 2015) ("The recent registration of a vehicle can contribute to reasonable suspicion."). Fourth, Defendant Martinez-Torres was on the insurance but not on the registration. Finally, the route taken, California to Texas via I-40, based on Deputy Mora's experience and training, is a common contraband travel route. All of these facts viewed together support a reasonable suspicion of drug trafficking activity. Therefore, any extended detention after Deputy Mauricio arrived was supported by reasonable suspicion.

C. **Reasonable suspicion grew between minute 16 and minute 33**.

Moreover, Deputy Mora's reasonable suspicion only became stronger as the encounter went on, further supporting any extended detention or prolonged questioning between minute 16 and minute 33. During this time, the Deputies asked additional questions about travel plans and car ownership, whether Defendants had any contraband, and weather they consented to a search of the vehicle.

In addition to the facts above, Deputy Mora heard their implausible and inconsistent story about why they were traveling back and forth between California and Texas numerous times. *United States v. Ludwig*, 641 F.3d 1243, 1249 (10th Cir. 2011) (bizarre travel plans may contribute to reasonable suspicion of criminal activity). Defendants' explanation about where they were going and what they were going to do at their destination was inconsistent and implausible.

Deputy Mora observed extreme examples of nervousness. He observed legs shaking; Defendants would not look him in the eye, and whenever they asked a question, he would look back at the vehicle. These extreme, articulable instances of nervousness support reasonable suspicion. *United States v. White*, 584 F.3d 935, 950 (10th Cir. 2009) (internal citations and quotation marks omitted)

Moreover, Deputy Mora did not get any reasonable answer on who owned the car. Rather, the Defendants apparently did not know who the owner was. *United States v. Ludwig*, 641 F.3d 1243, 1249 (10th Cir. 2011) (absent third party owner is a factor that may "indicate a stolen vehicle or drug trafficking"), *citing United States v. Olivares–Campos,* 276 Fed.Appx. 816, 821 (10th Cir.2008) (unpublished) *and United States v. Turner,* 928 F.2d 956, 959 (10th Cir.1991) (defendant driving car not registered to him supported reasonable suspicion); *see also United States v. Pettit*, 785 F.3d 1374, 1381–82 (10th Cir. 2015) (defendant driving vehicle registered to absent third party can indicate drug trafficking). Thus, for the reasons stated above and herein, Deputy Mora had

reasonable suspicion to extend any detention between minute 16 to minute 33 to ask additional questions.

## III. Deputy Mora had consent to ask further questions after traffic stop ended (beginning around minute 15-16, to minute 33).

Alternatively, even if the deputies did not have reasonable suspicion to continue the detention and question the Defendants after the traffic stop ended, they had consent to ask further questions beginning around the fifteen to sixteen-minute mark. The traffic stop ended at approximately 15:58 into the encounter, when Deputy Mora gave Defendant Martinez-Torres his citation and gave him back all of his documentation. Deputy Mora then told Defendant Martinez-Torres he was free to go but asked for permission to ask him more questions. The Deputies also relayed that conversation to Defendant Gomez-Arzate and told him they were free to go and that Defendant Martinez-Torres' documents had been returned. **Gov. Ex. 3, p. 23-24.** Both Defendants consented to further questioning.

For consent to be valid, the Government must show that (1) there is clear and positive testimony that consent was unequivocal and specific and freely given, and that (2) "consent was given without duress or coercion, express or implied." *United States v. Guerrero*, 472 F.3d 784, 790 (10th Cir. 2007); *see also United States v. Jones*, 710 F.3d 1300, 1318 (10th Cir. 2012). The Government bears "the burden of proving that consent is given freely and voluntarily." *United States v. Jones*, 701 F.3d 1300, 1318 (10th Cir. 2012) (citation omitted). Voluntariness of consent "is a factual issue, determined through the totality of the circumstances." *United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007).

A traffic stop may evolve into a consensual encounter, for "[o]nce the officer has returned the driver's documents, further questioning amounts to an unlawful detention only if the driver has

objectively reasonable cause to believe that he is not free to leave." *United States v. Chavira,* 467 F.3d 1286, 1290 (10th Cir.2006). "Whether an encounter can be deemed consensual depends on whether the police conduct would have conveyed to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter." *United States v. Bradford,* 423 F.3d 1149, 1158 (10th Cir.2005) (quoting *United States v. West,* 219 F.3d 1171, 1176 (10th Cir. 2000)).  Here, both Defendants gave clear, express, and unequivocal general consent to continued questioning.  Defendants also gave no indication they wanted the encounter to end.

### A.        <u>Defendants' express consent was not coerced</u>.

Determining whether consent was coerced "turns on whether a reasonable person would believe he was free to leave or to deny the officer's request..."  *United States v. Guerrero*, 472 F.3d 784, 790 (10th Cir. 2007).  The Court considers the following non-exclusive factors:

> the threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed place; and absence of other members of the public.

*Id.*; *United States v. Jones*, 701 F.3d 1300 (10th Cir. 2012); *see also United States v. Thompson*, 546 F.3d 1223, 1226 (10th Cir. 2008) (additional factors); *United States v. Harrison*, 639 F.3d 1273, 1279 (10th Cir. 2011) (additional factors).

Here, the Court concludes that the factors weigh heavily toward finding consent was voluntary and not coerced.  No deputy brandished a weapon until the contraband was found and the defendants were arrested.  The tone of the officers was conversational and not aggressive, and nothing they said in their tone or words indicated that compliance was necessary.  Deputy Mora returned all of Defendant Martinez-Torres' documentation, and relayed that fact to Defendant

Gomez-Arzate. The encounter occurred in public view. Moreover, the Deputies gave Defendant Martinez-Torres the opportunity to call his daughter. Only two or three Deputies were present when Defendants gave their consent, and there is no indication they were positioned in a coercive manner.

There was no evidence of any show of authority. The Deputies did not unholster or draw their weapons, physically touch the Defendants, or use a commanding or aggressive tone indicating that compliance was mandatory.

Moreover, Defendants were both told they were free to go and were then asked for consent to continue the questioning. *United States v. Sandoval*, 29 F.3d at 544 (The Tenth Circuit has "regularly considered, as 'important factors' on the issue of voluntariness although not dispositive, whether the driver was informed of his right to refuse consent *or to proceed on his way*.") (emphasis added). This weighs toward finding that consent was voluntary.

Defendant Martinez-Torres appears to argue that Deputy Mora detained Defendnat Martinez-Torres when he called out "Guillermo!" Here, after Defendant Martinez-Torres was given his documents and citation, he began walking back to his car and Deputy Mora called out "Guillermo!" Defendant Martinez-Torres voluntarily walked back, and Deputy Mora (through Deputy Mauricio) said "Do you- do you understand you're free to go? But we want to ask you some more questions, if that's okay." Deputy Mora repeated that "do you understand that you are – you are free to go?" Defendant Martinez-Torres replied "yes." Both Deputies were polite and pleasant during this interaction. Therefore, the Court concludes that this interaction did not convey an overbearing show of authority. *See, e.g., United States v. Jimenez-Valenia*, 2009 WL 1181324, at *6 (D. Utah May 1, 2009) (Defendant was called back after traffic stop ended), *aff'd*, 419 F. App'x 816 (10th Cir. 2011).

Based on the totality of the circumstances, the Court finds that this consent was voluntary and not coerced.

**B.** **Passenger (Defendant Gomez-Arzate) consented to additional questioning**.

Defendant Gomez Arzate asserts that he could not have voluntarily consented, because he was sitting in the car and did not hear the Deputies' conversation with Defendant Martinez-Torres

But here, Defendant Gomez-Arzate was told by Deputy Mora that Defendant Martinez-Torres was given all of his documents back, was only given a warning citation, and was free to leave. Deputy Mauricio then told Gomez-Arzate that he was free to leave, but asked for permission to ask him further questions. **Gov. Ex. 3, p. 24.** Defendant Gomez-Arzate then consented. These circumstances are therefore distinguishable from *United States v. Guerrero-Espinoza,* 462 F.3d 1302, 1309 (10th Cir. 2006), in which the passenger had no knowledge that the documents were returned or that the driver was told he was free to leave.

Moreover, based on the totality of the circumstances, the Court finds that Defendant Gomez-Arzate's consent was voluntary and uncoerced. Therefore, a reasonable person in either Defendants' position would have believed they were free to go.

**IV.** **Deputies had consent to search car.**

Later on, Defendants also consented expressly and voluntarily to the search of the car. Defendants consented orally and in writing.

**A.** **Consent was voluntary and uncoerced.**

As explained above, the totality of the circumstances indicates that Defendants' consent to search the car was voluntary and uncoerced. There was no government action that implied the Defendants had no right to refuse consent to search. Moreover, both Defendants consented in writing to the search, and the record indicates they had the opportunity to ask questions about the

form and they understood it. "A signed consent form is indicative of a voluntary consent." *Eidson v. Owens*, 515 F.3d 1139, 1147 (10th Cir. 2008), *citing Glover,* 104 F.3d at 1584. Defendants read the consent form. The consent form was in Spanish, and the Deputies verified that both Defendants could read Spanish and understand the form. Based on the totality of the circumstances, the Court concludes that Defendants' consent was voluntary.

Defendants appear to argue that they were confused as to what would be searched. The Court disagrees. The Deputies asked for permission to search the car, and the written consent form indicated that the car would be searched.

**B.      Search was within scope of consent**.

Defendants argue that the search was outside of the scope of consent, because the search went on too long and the deputies dismantled and allegedly damaged portions of the car.

1.      Duration of Search.  Defendants argue that the search went on too long, exceeding the scope of consent. "There is no absolute rule specifying the permissible duration of a search performed with the defendant's consent. Rather, the court asks what a reasonable person would have understood to be the scope and duration of his consent under the circumstances." *United States v. Carbajal-Iriarte*, 586 F.3d 795, 801 (10th Cir. 2009) (combined searches lasting an hour and half to two hours did not exceed scope of consent), *citing United States v. Rosborough,* 366 F.3d 1145, 1150 (10th Cir. 2004) ("As to duration, we find nothing in the record that would suggest that Rosborough objectively communicated a request to limit the duration of the search…").

Here, the search took approximately an hour and a half.  Defendants did not limit or provide any parameters for the search.  Moreover, they did not at any time object to the duration of the search.  Rather, they both consented to the search orally and in writing.  Finally, there is no

indication, and Defendants do not argue, that the officers lacked diligence in their search. Therefore, the Court concludes that the duration was of the search did not exceed the scope of Defendants' consent.

        2.    <u>General consent to search</u>.  "A defendant's failure to limit the scope of a general authorization to search, and failure to object when the search exceeds what he later claims was a more limited consent, is an indication that the search was within the scope of consent." *United States v. Jackson*, 381 F.3d 984, 988 (10th Cir. 2004)*; see also United States v. Amador–Beltran*, 655 F. App'x 666, 668 (10th Cir. 2016) (Amador–Beltran's "consent to the search of [her] bag for narcotics could be reasonably construed as consent to search any containers within the bag which could have held narcotics.").  The Tenth Circuit has "consistently and repeatedly [] held a defendant's failure to limit the scope of a general authorization to search, and failure to object when the search exceeds what he later claims was a more limited consent, is an indication the search was within the scope of consent." *United States v. Gordon*, 173 F.3d 761, 766 (10th Cir. 1999).

    A "general consent" search may also include partially disassembling vehicles when a defendant does not object.  *See United States v. Marquez*, 337 F.3d 1203, 1209 (10th Cir. 2003) ("We are therefore presented with a situation not much different than the situation presented in several of our cases upholding an officer's partial dismantling of an automobile pursuant to a general consent to search when the suspect did not object."); *see also United States v. Felix*, 12 F. App'x 827, 831 (10th Cir. 2001), *citing United States v. McRae,* 81 F.3d 1528, 1537-38 (10th Cir.1996) (removing trunk carpeting); *United States v. Santurio*, 29 F.3d 550, 553 (10th Cir.1994) (unscrewing strip holding down interior carpet and removing carpet); *United States v. Pena,* 920 F.2d 1509, 1515 (10th Cir.1990) (removing rear quarter panel vent and cardboard found beneath); *United States v. Espinosa,* 782 F.2d 888, 892 (10th Cir. 1986) (removing back seat).

Here, Defendants gave general consent to search the car. Because Defendants did not give any limit on the scope of the search, this general consent included consent to partially disassemble the car, as cited above. Defendants did not limit the scope of consent or object at any time during the search. Rather, they both signed a written consent form to the search of the car and agreed to the search orally. Under the specific facts of this case, the Court concludes that the deputies did not exceed the scope of the Defendants' consent to search.

        3.   <u>Partial dismantlement of car</u>. Defendant asserts that general consent usually does not include consent to destroy or render an object useless, unless specifically consented to. *United States v. Osage*, 235 F.3d 518, 522 (10th Cir. 2000) ("We therefore hold that, before an officer may actually destroy or render completely useless a container which would otherwise be within the scope of a permissive search, the officer must obtain explicit authorization, or have some other, lawful, basis upon which to proceed.").

Unlike in *Osage,* there is no indication here that the search "destroy[ed] or render[ed] completely useless a container." *Osage*, 235 F.3d at 522. Rather, if any damage did occur, it was "well short of the complete and utter destruction or incapacitation as in *Osage*." *United States v. Marquez*, 337 F.3d 1203, 1209 (10th Cir. 2003) (removal of plywood nailed down to bench in RV was *de minimis* damage); *see also United States v. Jackson*, 381 F.3d 984, 989 (10th Cir. 2004) ("any loss or contamination of the baby powder by Perry's search with his blade was *de minimis* and well short of the type of complete and utter destruction or incapacitation that was the focus of our concern in *Osage.*").

Moreover, there is no indication in the record that the vehicle was even damaged during the search. Here, prior to removing the rear quarter panel, Deputy Mora observed tool marks near the rear quarter panel. The testimony given was that a quarter panel, when taken off, can be put

back on without any further damage. In fact, someone had already taken off the quarter panel and put it back on to hide the drugs.

There was also testimony that the air filter was removed. But there is no indication in the record that removing the filter caused any sort of damage. Rather, an air filter is a removeable and replaceable part. Finally, a fender was taken off, but it was put back on. Therefore, the Government has satisfied any burden of showing that no damage occurred.

Here, Defendants argue that they were both told to stand away from the car, therefore could not observe the search and could not object. But Defendants could see that the car was being dismantled – in fact, one of the Defendants even offered to assist to put the fender back on. Under these circumstances, Defendants had the ability to object to the dismantlement of the car or revoke their consent.

Instructing Defendants to stand away from the car was a reasonable safety precaution and under the totality of the circumstances, did not turn the encounter coercive. *United States v. Manjarrez*, 348 F.3d 881, 887 (10th Cir. 2003) (pat down following consent to search car was reasonable for officer safety, did not turn encounter coercive); *United States v. Harmon*, 785 F. Supp. 2d 1146, 1174 (D.N.M. 2011) (after consent given, asking Defendant to walk a little ways so that search could be conducted in a safe manner), *aff'd,* 742 F.3d 451 (10th Cir. 2014); *see also United States v. Jimenez-Valenia*, 419 F. App'x 816, 821 (10th Cir. 2011) (unpublished) (Defendant standing 100 feet from car that was being searched had opportunity to revoke consent).

## V. <u>Any prior illegal detention was attenuated and not a but-for cause of Defendants Granting Consent to Search Car.</u>

The Government argues that any illegally prolonged detention was not a but-for cause of Defendants granting consent to search the car and was otherwise attenuated. The Court did not

find any illegal detention, but as an alternative basis for denying the motion, agrees with the Government.

### A.    __But-for causation analysis__.

Generally, evidence will not be suppressed as fruit of the poisonous tree unless an unlawful search or seizure is at least the but-for cause of its discovery.  *See United States v. Chavira,* 467 F.3d 1286, 1292 (10th Cir. 2006) ("There is no indication that the trooper would not have requested or obtained consent to search the truck but for the inspection of the VIN on the doorjamb. We may not suppress evidence without but-for causation."); *United States v. Nava-Ramirez,* 210 F.3d 1128, 1131 (10th Cir. 2000) (stating that to establish a factual nexus the defendant must show that the evidence "would not have come to light but for the government's unconstitutional conduct.").

Here, even if the VIN search or questions about travel plans or ownership of the vehicle impermissibly prolonged Defendants' detention, the record does not indicate that this was a but-for cause of Defendants granting permission to search the vehicle.  Moreover, the deputies conveyed to the Defendants that they were free to go.  Each time the Deputies requested permission to do something, Defendants freely gave consent.  There was no indication of coercion or pressure as a result of the delay that caused Defendants to consent.  In other words, there is no indication that the deputies would not have obtained consent to search the vehicle but-for the questions and the VIN search.  *Chavira*, 467 F.3d at 1291.

### B.    __Attenuation Analysis__.

Under the attenuation doctrine, "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *Utah v. Strieff*, ——

U.S. ——, 136 S.Ct. 2056, 2061, 195 L.Ed.2d 400 (2016). The Court analyses the following factors: "1) the temporal proximity between the police illegality and the consent to search; 2) the presence of intervening circumstances; and particularly 3) the purpose and flagrancy of the official misconduct." *Melendez-Garcia*, 28 F.3d at 1054.

As to the first factor, there is a close temporal proximity between the alleged seizure and Defendants' consent to search the car. This weighs against attenuation.

As to the second factor, the Government must identify events that "isolate[ ] the defendant from the coercive effects of the original illegal stop." *United States v. Gregory*, 79 F.3d 973, 980 (10th Cir. 1996). Here, the Deputies returned Defendant Martinez-Torres documents, advised both they were free to leave, and asked for consent to search the car. The Deputies obtained this written and verbal consent prior to any search of the vehicle. After verbally consenting, the Defendants read the written consent form of the search and signed it. The Deputies made sure that Defendants understood the form. The Court finds that this factor weighs towards a finding of attenuation. *See Mendoza–Salgado,* 964 F.2d at 1012 (explaining a consent form and advising an individual of the right to withhold consent), *cited in United States v. Fox*, 600 F.3d 1253, 1261 (10th Cir. 2010).

As to the third factor, there was no purposeful or flagrant misconduct. "[P]urposeful and flagrant misconduct is generally found where: 1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless and 2) the misconduct was investigatory in design and purpose and executed in the hope that something might turn up." *Fox*, 600 F.3d at 1261. The impropriety of misconduct, if any, was not obvious, and there is no indication that the Deputies knew their behavior was unconstitutional. Moreover, the Deputies did not engage in a fishing expedition. As explained

above, they had strong reasonable suspicion of drug activity. This factor weighs toward attenuation.

Therefore, viewing the factors together, the Court concludes that any prolonged illegal detention was attenuated from Defendants' consent to search the car.

## CONCLUSION

The initial traffic stop was valid and not impermissibly prolonged. Beginning around the fifteen to sixteen-minute mark, the traffic stop ended and became a consensual encounter. Alternatively, any prolonged detention was supported by reasonable suspicion. Finally, Defendants voluntarily consented to the search of the car, and such consent was attenuated from any illegal detention. Therefore, Defendants' motion to suppress **(Doc. 29)** is **DENIED.**

**IT IS SO ORDERED**.

_____
CHIEF UNITED STATES DISTRICT JUDGE